When New York and New Jersey formed the Waterfront Commission Compact in 1953, they intended to prohibit unilateral termination. We know that from both the historical practice of compacting at the time and the circumstances of this compact. The history and tradition of compacts leading to 1953 shows the prevailing understanding that unilateral termination is not allowed unless the compact expressly grants that power. Out of 80 compacts before 1953, approximately 56 omitted a termination provision. New Jersey seems to admit that despite that omission, most of these compacts did not allow unilateral termination. When New York and New Jersey omitted a termination clause here, they intended the same result, no unilateral termination. New Jersey points to commercial contracts and treatises about them, but states agreeing to jointly regulate labor and protect against organized crime do not have the same expectations as buyers and sellers of goods. Prior compacts and the authoritative treatise about compacts formed the state's expectations here. That treatise says that unilateral termination is not allowed unless the compact expressly says so. The text and circumstances of this compact further show that the states did not allow unilateral termination. For example, the compact requires joint agreement for nearly everything. The likely expectation was that joint agreement would be required to abolish the commission. This intent makes sense because by 1953, the states already jointly managed terminals in a shared court district through the Port Authority Compact, a compact that predated and is expressly linked to the Waterfront Compact. And that compact, the Port Authority Compact, is silent on termination after the Port Authority began operating. The states exercised their sovereignty in forming the compact here and then relied on that sovereign arrangement in developing their shared court. The states would have said expressly if they were going to allow this one state to withdraw at any time and regulate alone in their shared court. I welcome the court's question. If you were suing New Jersey, would you concede that you have subjected your sovereignty to this compact by not being able to withdraw? Well, I think, I mean, entering a compact is itself a sovereign arrangement that both states enter. But if you enter into it, are you permanently subjecting yourself, your sovereignty, to the compact terms? Well, you are agreeing to a sovereign arrangement. I don't think that the states intended it here to be permanent. They did think there might come a time when they would jointly decide that it was time to end the compact. But when you, when states, when the two states here, and I think generally when many states return to the compact form, they do that because it is a special sovereign arrangement where the states are meaning to bind themselves going forward. I think we agree on that, but once doing it, does, is it permanent unless they agree jointly to end it, if there is nothing said about the length of the compact? Yes, it is, it is, you, the two states here contemplated that they would end it either together when they jointly decided that it was no longer needed, or they might come together and just decide even though we think it's needed, it's too much hassle, we're going to do something else. And in this compact, there's also one other way for it to end, which is the congressional repeal. So that is the other way. But they said nothing about ending it. They had other modifications and other terms that had to be jointly decided, but nothing about terminating it. So what I'm hearing you say is that if they say nothing about terminating it, they basically sacrifice their sovereignty permanently unless the other party agrees. Well, two, two responses to that. I don't think it's a sacrifice of sovereignty. I don't think compacting is a sovereign giveaway. It is a mutual exchange of sovereignty where each state gets a benefit. Each state here would get to have some sovereign regulatory authority over the port terminals in the other. And they did agree to keep that going until they decided together to end it. And there are indications in both this compact and the history of compacts generally that that is what the states would understand. That they would understand that when you do a compact and you don't say anything express about termination, that you are sticking together until you jointly decide to end it. You said in your opening, you said that the parties omitted the termination clause. But there's no evidence that they made a conscious decision to do that, is there? We're just dealing with a situation where, as far as we know, they didn't address the issue at all. We don't have a discussion specifically about a termination clause in the history, but we do have indications both in the compact and the history about what they intended. And I think there are five indications in the compact. And it's important here to read them in the context of the history because there isn't an express termination provision either way. And the first indication is the express link between this compact and the Port Authority Compact. So this is in Article 2 of the Waterfront Compact at 3A in the complaint appendix. It defines the Port District as the pre-existing Port District that was created by the Port Authority Compact and that already existed at the time of the Waterfront Compact. And that's very important because the shared port was the reality for these two states when they entered the Waterfront Compact. By 1953, through the Port Authority, both of the states were already managing Port Newark on the New Jersey side and they were managing two port piers on the New York side. Well, but that's a whole different level of cooperation, the whole port. That's a lot of stuff going on. This is a very important but relatively small enterprise dealing with a particular problem. It's one thing to say that, well, you can learn unilaterally change the Port Authority of New York and New Jersey. It's quite another thing to say, well, you can unilaterally change this. How many employees does this commission have? Around 70 right now, Your Honor. Okay. Well, that's not a big number when you're talking about the Port Authority. So I'm not sure that either practice or the terms of the compact for the whole Port Authority itself is necessarily pertinent to this really small enterprise. Well, I think the link is very important because although the commission might not have as many employees as the Port Authority, it was a very big deal when it was formed and it was still over the past 70 years been a big deal for this port. When they entered the waterfront compact, the two states together because of their shared port, they faced a really tremendous problem of crime and corruption at the shared port that the Port Authority was not set up to deal with. Big deal might not have been the most felicitous term. What I meant to convey is that it's hard to unscramble the eggs when you're talking about the Port Authority as a whole. Here it's not that disruptive. Well, we do think it would be disruptive. And one reason is because even if you unscrambled the commission, the Port Authority will remain. I think the parties here agree that the Port Authority compact does not allow unilateral withdrawal, even though it was silent about withdrawal after a very short development period. And so even if you unscramble the commission, New York still has sovereign and proprietary interests in the terminals in New Jersey that belong to the Port Authority. And you'd be taking away New York's sovereign interest in having a regulatory say over that. And the point of doing a bi-state commission was to prevent, better prevent government capture. It is harder for corruption and undue influence to take hold if it has to succeed in both states. Can I ask you about, in response to the Chief Justice who was asking about the party's intent and the evidence and what we know about it, what about the evidence in the negotiation history that they were silent on termination in part because they did not want to signal to those who would be governed by this compact when it ended? I thought there was some evidence about that. And so in that world, if you're thinking about that, you're not really drawing all that much from the silence that, in fact, they did think, should we put in a termination clause? And the answer was no, because then people would know that we would be leaving and the corruption that you're talking about would start. But that doesn't undermine the thought that everybody knew that this was going to be temporary just until we got a hold of this corruption problem. So what do we do with that evidence? Yeah, you're right. There is evidence that there were suggestions to put in like a sunset clause, you know, three years, 10 years, whatever it was. And that was rejected because they wanted to guard against letting the corruption and undue influence come back. Right. But why doesn't that undermine your argument that nobody was thinking about termination or that they thought that this would go on in perpetuity and therefore both parties would be forever bound? It seems to me that that undermines that view. So why doesn't it? I don't think so, because it shows that there was some thought about termination and they decided not to say expressly that it would end at a certain point. And what they also discussed was this idea of government capture. New York Governor Dewey said at the time during the Crime Commission hearings that we want to do a bi-state solution, because if you only have one, if you have the two states doing parallel, you know, let's say parallel commission, then sometime down the line and Governor Dewey even said this, not immediately, but sometime down the line, corruption and undue influence may take hold in one state or the other. And that would ruin the effect. Right. But I guess you want us to infer from the silence that they intended for this to continue forever and that no or that they would jointly agree to leave, but that one couldn't decide I'm done and out. And I guess what I'm trying to push back on is that if the reason they were silent was not because they thought this was an agreement for all times, but because they were worried about signaling to the mob bosses that they would be leaving. I don't know that we can draw the inference that you want us to draw. Well, I think I don't think I'll push back on the idea that it was supposed to be for all time. I do think they intended to decide together when it wasn't needed anymore. And I think they didn't intend for one state to be able to make the decision to say, OK, now the mob bosses and the undue influence could be able to come back. And I think, you know, there are other indications in the compact as well and in the history of the compact, such as the annual reporting to both state governors about whether the public necessity for this compact was still needed. And if you read that provision together with the Article 1 declarations about what the So in Article 1, the compact talks about the public need and it's a public need that's joint. It is, they say in Article 1, that regulating port labor is deemed to be the exercise of the power of both states for the benefit, the public safety of both states. In that respect, as I understand it, and I am no expert from New Jersey and New York compacts, I confess, it does require funding from the legislature, from both legislatures to work on an annual basis. And what's the difference functionally between New Jersey deciding not to fund the commission any longer and what it's done here? Sure. Sure. Well, it's just the assessments come from the shipping industry, but then the budget is presented to both governors and either governor does have a veto power. But that provision and some of the other provisions that require joint votes in order to act, they do not suggest an implied power to unilaterally terminate. But do you agree, though, that New Jersey could unilaterally refuse to fund? They could, the governor could unilaterally veto pieces of the budget, so the money doesn't come directly from either New Jersey. No, I appreciate that clarification, but it would still leave New Jersey effectively able to withdraw by vetoing. Well, they have the power to veto the budget, but that is not the same as effectively withdrawing. That's what I'm trying to get at. What's the difference? The difference is you say they can do that, but they can't do this. What's the delta? What are we complaining about? Sure. The difference is if either state blocks the whole budget, but the compact remains, that would harm both states because it would upend operations at the port because now no longshoremen and other workers can't get licenses. Now the commission won't be able to revoke licenses if there are criminals at the port. When the industry would want to add jobs, that wouldn't be able to happen. But presumably all those complaints flow from terminating the compact, too, no? Well, but what New Jersey wants to do is terminate the compact and then set up by itself almost the exact same commission and it would be able to keep. All right. And I'm sorry for dragging this out, but let's say they veto the budget and then set up their own operations. I see. What would prevent them from doing exactly what they've done so far or seek to do so far? That's because the compact requires for someone to work in the specified jobs in the compact. You have to have a license from the commission. So if New Jersey set up a shadow commission while this compact remains, it could give out licenses. But that wouldn't help anybody because they still couldn't work at the port without a commission license. And so that's why if either state tries to take the commission to the brink by just vetoing the budget, they have the power to do that. But that shows that they have the power to get both states back to the negotiating table to find a compromise. And that's what we think these provisions can show. Ms. Ellis. Sorry, can I turn to a different question? I don't know if you gave up the game when you said the parties didn't intend for this to last perpetually. I've been stepping back from this case and let me walk you through my thinking. What does a compact that lasts in perpetuity mean? It can only mean that it will last so long as both parties want it to last. Any party, both of these parties, even if it said you can't unilaterally get out of this, both parties could come together and say, we don't think this is right, correct? Correct. So in my mind, a perpetual contract is different from a non-perpetual contract. When one party can keep somebody on the hook indefinitely, that can be the only difference, correct? Well, I do agree that it's always the case that two states could come together and decide, we don't want to do this anymore. So it seems to me that really when we're talking about a non-perpetual contract or a perpetual contract, it's always the case that one party can keep somebody on the hook indefinitely, and when they don't want to, correct? Yes. And then they also can go to Congress. So we know here that the parties never intended for this to be perpetual. And so I see the question as what are the situations in which one party can withdraw? Once you said they didn't intend for it to be perpetual, I think that's the end of the game. Well, I think once you assume that and it's very clear they didn't intend this to be perpetual, Justice Jackson pointed out the reasons, then really what we have to be able to say is one party can't keep the other on the hook forever. Well, I think when they refer to perpetual in the history here, they were acknowledging that they thought at some point the two states would come together and decide to end it. And I think that doesn't make any sense because both legislatures get the annual reports. And I don't see what they can do with it other than to choose to either veto items or say, I don't want to be in this anymore. It doesn't make any sense to say we don't intend this to be perpetual, but we're going to let one of the parties keep us there forever. It's a contradiction in terms in my mind. Well, I think there's also a difference between it's always the case that states could come together and decide to end a compact, even if they think this is still a great idea. But for whatever reason, we just don't like it anymore. It's too much of a hassle. But what they meant here when they said it's not perpetual was that they had a joint problem in a shared court and they wanted to take care of it together with a by state commission because that commission provided extra protection against government capture. If the compact had not been entered into both New Jersey and New York could exercise criminal law enforcement authority and regulatory authority over the portions of the covered area within their borders. Right. That's right. Although I just both states do still have criminal law enforcement authority in their borders. They would have they would have plenary authority, except except in so far as the federal government had had authority. But another state would not have authority there. Correct. OK, now, your argument is and this may the parties may have agreed to do this to surrender this sovereign authority perpetually. And I think that's been the thrust of some of the questions. So isn't that an extraordinary thing? And shouldn't there be a presumption against a state having done that, which could be overcome by a clear indication of a contrary intent? Well, I think it's not an extraordinary thing in compacts and compacts. And that's where if you look at the history of compacts leading up to this one, and if you look at the three compacts that these two states themselves had entered before this one, it shows that it was quite the tradition and practice to enter compact without having a termination provision in it and to understand that those compacts would continue until both states decided to end it. Is there a distinction? I mean, my understanding is that this background rule that you're referring to about no shared water, which is an entirely different thing. Well, we don't think that that distinction, this vested rights theory holds up when you apply it to compacts. And even if you did apply it here, we think this compact fits within it because the regulatory authority is tied to a geographic district. And I think if we look maybe a little bit at the history and how it how it unfolded, that might help. So I just clarify one thing, though, when you said it's tied to a geographic district, there was no ceding of any sovereign authority over water. I mean, New Jersey and New York didn't say, here, we're going to move the line between the states, anything like that. You're just saying that it was joint regulatory authority over the same geographic area. Well, the geographic area had already been designated, like with meets and bounds, in the Port Authority Compact. That's the port district. And then this compact expressly refers to that Port Authority Compact and says the port district that pre-exists, that these two states have already decided to have a shared, a shared regulatory power over, that's going to be the district where the commission's power is also linked to. But it's just about regulatory authority. It's not changing who owns the property. It doesn't change where the border is. That's correct. That's what I'm trying to establish. It's just shared regulatory authority. Yeah, I mean, I guess one way to think about it is in this compact, it's in two different pieces of paper, right? So sometimes you have compacts that both set the boundary and set up the jurisdiction sharing in one piece of paper. In this, what happened here was that they did the Port Authority Compact, they set the district, they had some sharing, and then later they had a problem that the Port Authority wasn't able to handle, so they did a second compact linked to the first that has more sharing, that has more sharing. And this is, if you look at the evolution of compacts, this was the tradition to omit a lot. Justice Kagan, do you understand ordinary contract principles to cut against you? In other words, do you accept the proposition that to rule for you, we would have to say that there's a different tradition and practice and default rule in compacts than there is in ordinary contracts? Yes, yes. Although even under regular contract principles, the first order of business is to look for the party's intent, which we think can be discerned here. And even in contract law, there are times when the default rule is different for certain specific kinds of contracts, like settlement agreements, you can't usually withdraw at will, covenants that run with the land, you can't usually withdraw. But the usual rule, I take it you agree, you know, if there's no specific provision in the contract, and if there's no clear indication of the party's intent from their negotiating positions or their performance or, you know, we're kind of at sea. The usual rule in contract interpretation is, oh, there's a contract with continuing obligations on both sides. That means one party could walk away. That is the usual rule for commercial contracts. We agree. Although some specific types of contracts are different. And this court said in Alabama v. North Carolina, that we don't just look to contract law and imply in default terms to compacts, even when those default terms are very common and very well settled. So is your view that the reason why we shouldn't use regular contract principles? I mean, there has to be something special and different about compacts. What is it? Is it found in the history? Is it found in some understanding of the function of compacts? What is it? Yes, there are several things that are unusual and different about compacts. One is the history and tradition, which I can go through. I think another one, before I march through the history, is that this is a unique form of sovereign agreement that has some features of contracts, but it also has features of a treaty, since it's between co-equal sovereigns. And for treaties... With the presence of sovereignty, I think some of the questions from the bench have at least cut both ways. You might say, well, it's a unique form of sovereign agreement, but Justice Alito just said to you, isn't it a kind of weird thing to think that any state gives up its sovereignty forever? So at the very least, these considerations of sovereignty cut both ways. It makes me think we should just go back to ordinary contract principles. Well, I think there is a very different tradition and understanding for compacts. And that's because if you look at the pre-1953 compacts, as I said at the beginning, 80 of those, and these are listed in the Appendix A in the blue brief, there were 80 and 56 omitted a termination clause. And yet New Jersey admits that many of them, I think about 36, do not allow termination. And that 36, they do a couple of different things. There are boundary compacts, which I think we all agree don't allow unilateral termination. But there's also shared jurisdiction provisions in some of those boundary compacts. And also there are some compacts that have shared jurisdiction without setting the boundary. And New York and New Jersey had one of those about this same harbor. This is the 1834 boundary compact between New York and New Jersey that both set the boundary and created a shared jurisdiction swap where sometimes New York has jurisdiction over the water up to the New Jersey line. Sometimes New Jersey has service of process jurisdiction up to the New York line. And that compact is understood not to allow unilateral withdrawal, even though it omitted a clause. It sounds like then that there's not any clear history that they, as you're saying, they're distinctive kinds of compacts. And I guess the question then is in a compact like this, what should the default rule be and why shouldn't the default rule be when there's silence? This would be a big deal for a state to give away its sovereignty and give away its right to unilateral withdrawal. So we as a court are going to establish the default rule being that you can unilaterally terminate and the parties can always negotiate around that and put in an express provision in the contract that would require both states to withdraw. Why isn't that the better default rule? Well, I think one reason is because we think the history and tradition before 1953 was pretty clear. All of those different compacts I was describing did the same thing. They omitted a termination clause and yet were understood not to allow it. Were any of them contrary? There were 36 out of 50. Can you give the numbers again? Oh, sure. Well, there are 56 that omitted a provision. We think that New Jersey agrees that at least 36 of those did not allow unilateral withdrawal. Then there's some more that I think we disagree about. So I can maybe the next most important group is the compact. Out of the 36, I think you were saying some of them were boundary ones and those are going to be different altogether, right? Well, some of them were boundaries. Some of them had jurisdiction sharing, which we actually think is quite similar to this compact. And then some of them did water allocations. But some of those set up agencies, which at least is similar to this as well. And all of those have this same feature of omitting a termination clause and yet being understood not to allow it. And then the next group is the 12 by state compacts that set up regulatory agencies, the first being the Port Authority compact. And that compact omitted a general withdrawal clause after the Port Authority was up and running. And yet I think the parties agree that unilateral withdrawal is not allowed. The Port Authority compact did have an unusual provision that allowed unilateral withdrawal only at a one time option after an early two year development period. And during that two year development period, the Port Authority couldn't operate yet and the states were still trying to figure out if they could ever even come up with a plan to make this work. You may want to save a minute or two for rebuttal. I think I saved five minutes for rebuttal, Your Honor. But I think you've used up a good bit of it. It's up to you. I'm happy to happy to stop. OK, thank you. You know, the what was the allocation of business between the New York side and the New Jersey side in 1953? It was predominantly on the New York side. It was about 70 percent on the New York side. And today? It's predominantly on the New Jersey side. The 80-20 is the numbers. OK, that's a fairly substantial change in the mix. And that may have something to do with an effort to reallocate or withdraw from a compact that was entered into in 1953. What if what happens is because of silt coming out of the Hudson or whatever, there's no business in this area on the New York side. It's all on the New Jersey side. Would that be a basis for New Jersey to say, you know, it's time for us to get out of this historic and useful but no longer relevant allocation, because what it's doing then is giving New York considerable authority over what is just New Jersey business. No. For two reasons. I mean, first, the idea that more business would come in on one side or the other was contemplated by these parties. New Jersey's governor at the time talked about that and said, even though more business may be coming in on one side, this is a joint endeavor, a joint responsibility. And the reason for that is because even if a lot of the goods come in on one side or the other, it's still a joint port and the goods still come in. I mean, massive amounts of goods come into New York, even if they land on the New Jersey side. And so it's a huge driver of our economy for our consumers. And New York will still have sovereign and proprietary interests in the terminals that the Port Authority owns on the New Jersey side. So let's just say, obviously a hypothetical, if the Port Authority compact is dissolved for one reason or another, surely they would then be able to get out of this one. I do think that would potentially be a more fundamental change, since when they agreed to this compact, the Port Authority compact was there. So if it's a fundamental change, one state can unilaterally withdraw? Well, I still don't know that they could unilaterally withdraw. I think that would maybe give each state, if the Port Authority was dissolved, that might give either state a good reason to to code off to the other and say, maybe, maybe we should dissolve. Well, I assume they talked to each other before this, too. Well, unfortunately, we don't think that New Jersey really did put in efforts to negotiate with New York, use the tools available to it expressly in the compact to try to find some agreement. Now, you just think they didn't do it enough or you're saying they didn't talk to you about this at all? I think there was not a lot of communication about this, as far as I know. I think the New Jersey legislature at times would just pass an amendment and then the New York legislature would consider it and decide this is a really bad idea. But there wasn't, as far as I know, a ton of communication. And I think you can't just divide up the port or or unscramble this that easily because both states relied on the commissions by state protections in moving forward with the overall joint endeavor of the Port Authority. So they set up the commission to do this together and then they relied on it in building out the port together. So New York and New Jersey together, for example, through the Port Authority, built Port Elizabeth, the first modern container terminal, which is on the New Jersey side. And the Port Authority still owns that facility. Thank you, Counselor. Justice Thomas, anything further? One question. What role does the requirement, the constitutional requirement that Congress give its consent to this compact? What should that play in our analysis? Sure. I think it plays. It shows that Congress did look at this compact and thought it wouldn't harm the federal interest. Congress did specifically reserve the power to repeal the compact or its approval if it wanted to. And that does show that these two states do have another out should there really be a horrible impasse. We don't actually think these states are necessarily at a horrible impasse. We think they can find a way to work together if they use the tools available to them in in the compact. But Congress does provide another avenue if needed. Justice Alito, if this were a treaty, could New Jersey unilaterally withdraw? No, the default rule for treaties is that unilateral withdrawal is not allowed if it's not expressly given in the treaty. And so we think that default rule is another piece to look at about what the state's expectations would have been here, because we're not saying that compact is exactly like a treaty, but it has features of a treaty such that it's between co-equal sovereigns. And that form of the co-equal sovereigns matters because states have historically gone to the compact when they want to bind each other. That's why they went to it for boundaries, for water and then for the port authority and then for agencies that follow. Has the United States unilaterally withdrawn from treaties? Yes, they have sometimes. Often those treaties, there was either expressly allowed it or it was wartime. There were some there are exceptions to any default and that happens. But I don't think New Jersey is seeking an exception to a default here. They're they're seeking the default itself, which for treaties is against unilateral withdrawal. Justice Sotomayor? Assume that I don't think anything points clearly. You rely on one treaty to say the default rule is no unilateral termination. Yet one of the professors you rely on, Simmerman, wrote approvingly of a U.S. position in a dryer case in 1951 that predated this compact. And there he wrote that outside of certain kinds of contracts, and I think he meant setting boundaries, the presumption should be that compacts call calling for indefinite continuing performance are subject to unilateral withdrawal. So he took their position contrary to yours. I look at the 86 contracts that you mentioned, many of them are boundaries, many are water rights. I'm actually not sure that where we get the default provision, that those are their sovereignty. And particularly with water rights cases, that's exactly what they're doing. They have sovereignty over that water and its use. So I don't know where this general rule comes. I also look at the contracts and certain numbers do reflect unilateral withdrawal. Some don't. The history is just all over the map. I keep going back to my simple point. Isn't the simplest rule is not one that makes presumptions about 86 contracts or compacts that I know nothing about. All of them seem very varied. Some of them have commissions, some of them don't. Some of them set boundaries, but they also create independent agencies. Why isn't the simple one, if the parties don't expect this contract to be indefinite, unilateral withdrawal is presumed. It's a simple rule. Here, the parties clearly stated it wasn't going to be forever, unlike your Port Authority Compact. Why isn't that a better rule? It would rule against you in this case, but isn't that the simplest way to decide this case? Well, no, Your Honor. I mean, I do think that it's also a simple rule to say that you know, states don't have the power of unilateral withdrawal unless they expressly say so. But that doesn't have anything to do with the party's intent. My rule does. I look at the contract and say here, by your own admission, the contract was not intended to be indefinite. I don't go to rules, I go to what the contract intends. But I think what these parties intended was to do the same thing that had been done before them in many other compacts, in the Port Authority Compact, in their own prior compacts. The contracts, the compacts are missed. Some give unilateral, some don't. Some are explicit, some aren't. They're all over the map. But I don't think that's accurate for the pre-1953 compacts. I think before 1953, it was fairly unified. It was there was no tradition at all of allowing unilateral withdrawal. The problem with that argument is until 1921 or so, most of the compacts only had to do with setting boundaries. That's right. So you're talking about a very short history that goes both ways. But I don't think the history before 1953 does go both ways, because before 1953, if you look at the bi-state compacts, which we think are most relevant, because for a bi-state compact, withdrawal terminates the whole compact, which isn't necessarily true for multi-state compacts. For bi-state compacts, there was no tradition of allowing unilateral withdrawal. They either omitted a provision and seemed to have been mostly understood not to allow it, or they expressly prohibited unilateral withdrawal. And those that expressly prohibited unilateral withdrawal were boundary and water allocation compacts. So they seem to have just been confirming the very same default rule that New Jersey agrees applies to boundary and water allocation compacts. And the Zimmerman, the Zimmerman treatise cuts in favor of New York because there is an article where Zimmerman sort of mused about the position taken by the federal government in the dire amicus brief. But both in 1951 and 1961, Zimmerman wrote the authoritative treatise on compacts, and he said that unilateral withdrawal is not allowed unless there's an express provision for it. And I think it is much more likely that the states would have been turning to treatises about compacts than treatises about contracts. And the Zimmerman treatise is not a law review article. It was published by the Council of State Government. Zimmerman advised on compacts that New Jersey was a signatory to. And this really was a resource at the time on compacts. Thank you, Justice Kagan. Ms. Vail, I think you said to Justice Thomas that you don't view New York and New Jersey as at an impasse. But most of the time, parties don't get to this court unless they're at an impasse. And I'm just wondering what what New York's view of the end game is here. I mean, I think one of the reasons why the normal contract rule is the way it is, is a sense that committing parties who are at loggerheads to indefinite performance just doesn't work and makes no sense for anyone. And so how is that going to be any different here? Well, I agree that we're at an impasse over unilateral withdrawal. But I think if unilateral withdrawal was not allowed, then the states could move forward. We don't think that then the commission would necessarily be completely frozen and hobbled because both states have a lot of power in this compact. They each do have power to say no to things that they don't like. They each do have power to adjust the budget if they want to. And so the states can use those tools to keep working together. And when New Jersey appointed its commissioner, they can also use those tools to shut things down. But we don't think they could. But we don't think that they really would. Because as I was saying earlier, I think that Justice Gorsuch, if you do that while the compact is intact, you bring pain to both states, you bring pain to the shipping industry and you bring pain to the workers. And I think the states set it up this way so that they would have to come back to the table and work together. And these two states need to keep working together for the Port Authority compact, for other compacts that they're in together and for other endeavors that they do. Justice Kavanaugh? Justice Barrett? So you mentioned that if withdrawal happens here, that there are some properties that something about the port belonging to both. Except you can, you agree, terminate it by mutual consent or Congress could terminate it. So I just wanted to clarify, it's not your position, right, that the fact that there might still be some things to unwind, that's no barrier because presumably those things would have to be unwound if it were terminated in the way you propose. I think, you know, if the states came together, they could find a way to unwind things. But if Congress just terminated it, then they would have to find a way to both trigger the unwinding and dictate the terms, if not what these states intended. And it doesn't make sense because of that continuing interest. So New Jersey says we're out of the commission, but New York, that harms New York sovereign interest in a couple of different ways. First of all, it allows one state to destroy a sovereign entity that belongs in part to another state. It also takes away the bi-state protections that these two states wanted in order to prevent the harms coming to either state if one state started regulating. Is that really why? I mean, I'm just wondering. It seems very odd that New York's hanging on to this when New Jersey has 82 percent of the shipping on its side. And as the chief justice was pointing out, the industry has so dramatically changed to container shipping and no longer net unloading and all of that. Is this fees? Like, what is New York really? Is it just. No, it's not that. No, I mean, the fees go to the commission. They don't go to New York. It's because the port itself, through the port authority, is a joint endeavor. I mean, New York still has strong, sovereign and proprietary interests in the terminals on the New Jersey side and massive amounts of goods come into New York. So if corruption and undue influence take hold on one side, that hurts consumers. That's that, you know, it ends up getting passed down to consumers and harming New Yorkers. OK, thank you. Justice Jackson, I just ask you whether you know. Whether any of the prior compacts that you're putting so much stock in were intended to be temporary. I mean, you've talked a lot about how there were former compacts and there were some of them were borders, some of them were water. Justice Kagan pointed out that, you know, are we looking at contract law or compact law? And I thought your answer was compact was sort of a species of contract law and that you've identified all of these compacts. But I think this might be yet another species of compact law in so far as this compact might be distinct because the parties that entered it went into it believing this is only going to be temporary. So do you have any analog for that in the other compacts that you've identified? The only analog I can think of is there was a compact to build the Lake Champlain compact was a bridge. It was a compact between New York and Vermont. And they did go into that thinking we're going to do this together. And then once the bridge is totally done, we'll figure out what we're going to do next. That's what that's basically what the compact said. And then once the bridge was built, I think there were some funding issues. And eventually they decided together to end it and to do it. Well, I mean, I don't know how analogous that is because they went into it with a project that seemed to have a definite duration. That is the building of the bridge. I don't I'm just going off of what you said. So when the bridge is done, I can assume that people thought, OK, we'll end it. Right. Here's an example I can think of of one where the states again went into it thinking we'll end it together. And then that's what happened. And we think that that is what they intended. Do you do you have evidence that they when they were talking about termination, because there is negotiation history evidence concerning people thinking about termination and saying we don't want to say anything about termination because but they assumed it would terminate. Do you have some evidence that they said eventually we're only going to we're going to terminate this by mutual agreement? We think that comes out of the fact that they talked so much about how it was a joint responsibility, how it was a one single port with ships and vessels and people moving in between peers that they understood it as a joint endeavor. And so even though they thought we will end it at some point, it was a joint endeavor. And so they thought they would end it jointly when the time came. One last question about trees. I understood that there were exceptions to the sort of unilateral withdrawal point that you made and that one of them was commercial or trading agreements could be the  So why wouldn't this fall into that exception, even if we thought that this was like a tree? I don't think that this is like a commercial treaty. The two states are not, you know, sending, buying and selling goods between each other or sending commerce, but they're regulating, they're regulating commerce, but they're doing it through licensing of labor. They're doing it through a law enforcement role to protect against organized crime and corruption at the court. It's not a, you know, I'm going to, I, New York, I'm going to give you these goods and you, New Jersey, are going to give me these goods, which I think is more of a commercial, a commercial treaty. All right. Thank you. Thank you, Ms. Vail. You will have five minutes for rebuttal. Sorry for my confusion. Mr. Feigenbaum. Mr. Chief Justice, and may it please the court. The question this case presents is whether the Waterfront Commission compact prevents New Jersey from reclaiming its police powers. As New York admits, there is nothing in the plain text of the compact that expressly limits New Jersey's withdrawal. And as New York this morning has confirmed, there is nothing that justifies a perpetual veto in an agreement New York now admits is not itself perpetual. Instead, the compact silence confirms that settled background rules apply. And those rules, contract law and state sovereignty, both well established by the contract law, are subject to withdrawal. Indeed, under this court's cases, including those cases involving government contracts, different categories of agreements are subject to different rules. On the one hand, there are agreements to convey property or to settle legal disputes over a particular res. Those agreements are presumptively permanent, meaning that states cannot withdraw from agreements settling boundaries or settling water rights. On the other hand, as New York has conceded this morning, contracts of continuing performance are different, that in the face of silence, parties can withdraw from agreements that would otherwise require them to keep performing forever. This compact is precisely the sort of arrangement from which parties can presumptively withdraw. In 1953, New York and New Jersey agreed to each delegate their own licensing and policing powers to the bi-state agency. But 70 years have passed and the New Jersey legislature has concluded that the commission now engages in overregulation of business and is ill-equipped to handle 21st century security challenges. New York believes that the New Jersey legislature can never reclaim its police powers, but New York's perpetual veto would deprive our legislature of the flexibility and the accountability to the people that are at the heart of sovereignty. I welcome this court's questions. But on the other hand, that seems as though if you can just walk away, you deprive New York of any sort of binding characteristics of a compact. I don't think that's right, Your Honor, which is why compacts so frequently do include express unilateral withdrawal provisions. While the parties remain subject to the compact, they are, of course, bound to its terms, but as in contracting law and consistent with what this court has said since the 19th century in Newton and Providence Bank about government contracts, it can still be binding on the sovereign while nevertheless not preventing the sovereign from controlling its own police powers going forward and making changes where necessary to stay accountable to the people. Do you think that would also be your view if New York had walked away? We do think that would be our view. I realize that what's good for the goose is good for the gander, Your Honor. And in particular for this compact, especially after 70 years have passed, as we have in this situation, we do think New York could walk away. We think the compact structure confirms that it would be incongruous to allow the parties to bring the commission to a halt, but nevertheless remain trapped within it forever. But we also think contract law and sovereignty principles cut this way. Well, finally, in water cases and boundary cases, there's a vested interest on the part of the parties, the sovereign parties. Do you think that New York or even New Jersey have either has any vested interests in aspects of this compact? No, Your Honor, and I think this court's case is going back about 200 years now, helped make clear exactly what that kind of settled right is and what that kind of settled right is not. So this court has used the phrase vested rights as effectively a shorthand to convey the sort of settled property promises or the settled legal disputes over res from which parties, including sovereigns, cannot later withdraw. So that's cases like Fletcher versus Peck in the land grant context. And that's cases like Hinder Lider in the water rights resolution context. What this court has said on the other side, again, going back to the 19th century in cases like Newton and in cases like Providence Bank, is relying on how the government is exercising or delegating its police powers is not the sort of thing another party, even another state, is entitled to rely on forever. Those are our police powers. And in making sure that future legislators have the ability to legislate as they see fit means not committing their exercise of those powers through mere silence. You say that either party can just walk away. Right. But of course, that's not true. This has been going on for 70 years. There are buildings here, buildings there, you know, bank accounts, ongoing investigations. It seems to me it's going to take a long time and hard work to kind of unravel all this. So isn't that a reason that the proper rule may be that you can't just walk away? So I don't think so for two reasons, Your Honor. The first is that courts have always understood the withdrawal from an agreement and the dissolution of whatever's been built on that agreement to be separate terms. And that's why in compacting practice, even when you see express unilateral withdrawal provisions or where you see express unanimous withdrawal provisions, you infrequently see dissolution terms. So this is true as a matter of compacting generally, that these are severable questions. And the lack of any language about dissolution tells us very nothing, tells us very little about how to construe silence, not unlike what Justice Barrett was pointing out earlier this morning. I'm sorry. I'm sorry. Go ahead. I was going to say the second point to this compact in particular is that I don't think this one will be terribly hard to unwind. So this is a compact about continuing exercise of regulatory authority. This was not like the Port Authority. This was not about constructing tunnels and bridges and anything of the sort. This is about licensing workers on an ongoing basis and inspecting and revoking their licenses. If the commission concludes they shouldn't be working at the port anymore. And those duties are easy to separate. We have four marine terminals in New Jersey. We have two marine terminals in New York. And each state returns to its plenary sovereign power. I don't see that the distinction you draw between ongoing responsibilities and what do you call the other category? So I think conveying subtle property rights is equally disputed. But I don't see that in our opinions. I mean, whether they're dicta or not, certainly the language in our opinions cuts pretty strongly against you. They have, you know, in the in the Sims case, an interstate compact cannot be unilaterally nullified. In the Northeast Bank Court, no compacting party may modify or repeal its law unilaterally. In HES, entities created by compact are not subject to the unilateral control of any one of the states. I mean, you can argue that that was dicta in those cases or that this case is particularly different. But we certainly don't have any case adopting the distinction you draw. So yes and no to that, Your Honor. I'm going to fight the premise slightly. But let me start with Sims, which I think is particularly helpful. This court specifically reserved the question of withdrawal in Sims. It referred to the solicitor general's position in that case and described it as attempting VISTA, that it didn't have to go down. So we know Sims and the language about unilateral nullification can't possibly have spoken to withdrawal because this court itself distinguished between the two. And I think that helps explain why language like HES and language like Northeast Bank Court, I don't even need to call those dicta. I just don't think they have anything to do with the separate question of withdrawal because it's regularly the case in contracting, including in government contracts, that one party couldn't control the exercise of those terms. But that doesn't say if after 70 years, the parties are allowed to return to the status quo ante. But here's where this court has drawn that distinction. It's drawn that distinction throughout its government contracting case law, including going back well a century before this particular compact. I think this court's opinion in Hinderlieter is particularly helpful on that score. This court's opinion, talking about a water rights case, says that in this case, we are dealing with the resolution of a dispute over water. That's the sort of kind you would expect to be presumptively permanent, just like Virginia versus West Virginia, the boundaries case, and just like Fletcher versus Peck, the case about Georgia conveying land grants. That's really different from what the court was simultaneously saying in cases like the continuing performance obligations. And that's why the United States itself drew this exact distinction in 1951 in its brief in that Sims case, which I think is a part of the background of compacting that the states would have been quite familiar with. So would you. What if a compact does both? What if it involves both vested rights and it involves this kind of continuing performance obligation? Then what presumption kicks in? So I don't think that's too difficult as a matter of presuming intent. And if you're conveying settled property rights or so, let's say you are resolving water rights and setting up a commission to make sure that no one is taking more water than they're supposed to under your conveyance. No, no, no. Let's just change this compact. And let's say that in addition to setting up the exact same commission that you have now, the compact also adjusted water rights between New York and New Jersey. So it did both things in the same agreement. Yeah, I don't think that you could withdraw from that situation, Justice Barrett. And the reason would be because you have a conveyance of a settled property right. In that case, water instead of land. But the point is the same. And when you're conveying property rights, cases from Marion to Fletcher to Virginia versus West Virginia make clear that those conveyances are not the kind that you would expect to be able to withdraw from. Could you still get out of the commission? So I don't think so in that case, because contract law and sovereignty principles don't allow for partial terminations. Those operate just like amendments. And it may have been critical in your hypothetical. Again, not a real world compact, but in your hypothetical, it might have been critical to say New Jersey that we got that bit of water in exchange for a licensing agreement we didn't otherwise particularly care for. And so just pulling out of the ongoing performance, but keeping the property we got requires both states to keep performing under the terms of an agreement that aren't what they struck. You don't see that in withdrawal and you don't see that in the ongoing performance context. Do you think that there are any hard cases? I mean, you have this world in which vested interests are in one box and and compacts like this are in another. But do we have to worry about any gray zone between the two? I could conceive of them in some of the hypotheticals. I think in the real world of compacts that exist so far, they largely do exist in buckets. I mean, most compacts are dealing with boundary agreements. They're dealing with settling water rights. This court is well familiar with those kinds of cases. And then you have, on the other hand, some very pure regulatory ones. You've got an agreement like this. You've got the Columbia River Gorge Commission, where it's an interstate zoning board that has to approve zoning ordinances backed by legislative funding obligations. Those are the sorts of agreements we think that you can withdraw from. Now, I think there are some hypotheticals, like what if you've conveyed some property and simultaneously had a commission that monitors it and the like? I don't think that's that hard, because, again, the test we're looking for is have you conveyed sort of settled property that would speak to intent. Now, why should we use this case to decide all those cases? You know, the word vested rights has many meanings. We just recently used it within the retroactivity case and said, I'll quote it for you because I found it so amorphous, I don't know why we said it. Something more substantial than immediate fixed right of present or future enjoyment. I read that and I said, okay. I hope I didn't write it. But my point, I go back to my point. I don't know what vested rights is, I don't know in what context and where. What's the difference between a compact that does the settlement of the water rights and the commission is not set up in that compact? Perhaps it's not set up in that compact the next day, but it is two weeks later. Does that give, you know, was that intended to be part of the boundary? We're going to have to decide all those issues when those cases arise. What's the simplest rule to decide this case without dicta about what vested rights means or anything else means? Tell me your simplest rule. I want to be very careful as I answer this, not to offend the author of that vested rights opinion, whoever it was. But what I want to say is there's a couple of different ways you could rule for us that don't address that question. I don't really see ways to rule for New York that don't end up having to foreclose some of these vested rights analyses in ways that I think would be really troubling on the ground to compacting. So I think some of the simplest ways to rule for us, one could be to say that particularly as here, whereas you and Justice Jackson have noted, there is evidence, as we've discussed, that this was understood to be temporary and there's nothing in the text of the compact that suggests any sort of perpetual or binding obligations paired with the structural argument that we offered. You could do a very specific to this compact argument. You could also say there may be more challenging cases in the future where there is a marginal application of whether you've conveyed settled property rights or whether you have only ongoing performance obligations, but that's not this case. This case is the classic example of police power. We are simply exercising and delegating our taxing authority, our licensing authority, and our law enforcement authority. I don't understand that species. Obviously, I understand the first because that was the thrust of my questions to your friend on the other side, but help me to understand why it matters that police powers are involved here. I thought we were applying contract principles and the reason that you would win was because the parties intended at the time of the contract to, you know, have this agreement go on, not indefinitely, and the background black letter contract principle is that when you don't speak determination in a services kind of contract like this, you get to withdraw. What I'm a little worried about is starting to turn this into something about police powers or sovereignty even because I don't really understand what difference that makes. So, that offers the third path and I, you know, teed up I might have three here. I do think you could do a contract law specific ruling. Now, I think one of the benefits here that might give you some comfort, Justice Jackson, is that the contract law principle and the sovereignty principles track so neatly in this. So, what is the sovereignty principle that you're drawing on and why is it helpful? So, the reason I think the sovereignty principle is helpful comes from Newton in the 19th century where this court explained that in a government contracting context, you would expect a clear statement as to the secession or the session of your police powers as to their scope or duration. And so, to the degree that you would expect that we've given up some sort of police power forever, in that case it was the control of the government. Wait, does that assume that you couldn't waive it indefinitely? I mean, the reason why I don't know that it has any real force is that to the extent that you're a sovereign and you have these powers and you enter into a compact, isn't the fact that you're entering into a compact your, you know, assent to give up the powers for whatever the terms of the agreement say? And if you don't speak to that, I don't understand why we couldn't also presume that you were willing to cede them indefinitely. Two responses to that, Your Honor. The first is, I don't think that's quite what was going on in the government contracting cases because there were, by definition of being a government contracting case, a contract to which the government had signed on. And nevertheless, the court was saying that because of the importance of the police powers, it is a momentous thing to essentially give that up in perpetuity subject to the other party. So, even when you can do it as a constitutional matter, you would expect something clearer. It's like the canon against derogation of the common law. You can derogate the common law. There's no problem with Congress derogating the common law, but it's a big deal when it happens. And so, you expect to see something clearer. That's the basic submission on sovereignty here. It's a big deal to say New York can control how we tax companies at four marine terminals in New Jersey, and you would expect something clearer before we do that. Now, again, to the second point, as Your Honor and Justice Kagan in a colloquy with Ms. Vail pointed out, you don't necessarily have to get in to whether sovereignty gives us an extra withdrawal rule because the contract law baseline is so clear. And this court's government contracting cases have always tried to figure out the delta between when do you treat a private party and the government party the same way and when the government is better off from the perspective of protecting its sovereign powers. What New York is asking for here, based on a history of compacting that I just don't see and an analogy to port authority that could hardly be more different, is that government sovereigns are worse off than private parties when it comes to the similar withdrawal rule on their own performance and their own police powers. How do we just say, without getting into the sovereignty, and I guess this goes back to one of your other pasts, there's a difference between contracts that are about continuing performance, and in this particular compact, the continuing performance involves regulatory authority. But if we're just looking at a contract that involves continuing performance, that's different. If I sell you my house, I can't come back later and say I want it back. But if it's a continuing performance contract, the rule about unilateral withdrawal is different. Can't we just say that? I think you could just say that and rule for New Jersey on that basis. I think contract law is quite clear here. I think it's notable. New York has never contested contract law in this case and how it would otherwise apply. And what this court said in the last New York versus New Jersey in 1998 is when you have silence on a particular term in a compact, that shows, quote, no intent to modify the settled background rules that are already in place. This court has said since 1823 that those background rules are contracting. It said compacts and contracts are synonymous. And so I don't really understand why there would be a history of compacting that justifies rejecting using the same doctrine this court used in Tarrant, that it used in Green versus Biddle, that the United States was discussing in the early 1950s as the backdrop right before this compact was enacted. And so I do think contract law, separate from the sovereignty issues, provides a clean pathway to ruling in New Jersey's favor. Interstate compact is not just a simple contract between parties. It has other attributes. Some of our cases have mentioned that. So do you want us to say that interstate compacts should always be interpreted in accordance with ordinary contract principles? And if not, what would we say to justify the use of ordinary compact principles alone in this case? I think this court's case has already provided a clear dividing line. So on the one hand, this court has already said that when the background contracting principle would require you to conflict with the text of the compact, that the statutory interpretation exercise does not allow you to do that. And that's Alabama versus North Carolina. But at the same time, cases like Tarrant and the last New York versus New Jersey make clear that where you have silence on a particular compact term, that the background contract law speaks to the silence of that agreement. So that's our clean organizing principle for when contract law steps in as the backdrop and when it doesn't. When the parties don't speak to the issue in their agreement, that is a sign they did not intend to modify what would otherwise have been the background rule. I don't know what New York's organizing principle is for when you use contract law and when you don't. I understand they don't think it applies here. It obviously did apply in Tarrant. But we have a clean, don't allow a conflict, but do use it to fill the silence of an agreement. Now, to the degree this court thinks compacts are, Your Honor, I see my time is up. You can finish your sentence. Thank you, Your Honor. To the degree that this court believes compacts are distinct, I think that also squarely cuts in our favor because of the special sovereignty interest long established before 1953 that suggests that a session of our taxing, licensing, and policing power should not be permanent. Thank you. Thank you. Justice Thomas? One quick question. Does the consent, Congress' consent, play any role in our analysis? So I don't think that Congress' consent in any way changes what I've discussed today. Congress has the ability to consent to compacts for a specific reason, as this court explained, which is to make sure that compacts don't become aggrandizing vis-a-vis the federal government. And obviously, with withdrawal, returning the states to the status quo ante, that's not a fear that anyone would have to have. Justice Alito? Justice Alito? Could you have walked away five years in? I think we could have walked away five years in. I think two points about that. The first is, I think that's the better rule when it comes to sovereigns. I think a contrary rule would require legislatures to guess if enough time has passed before they start exercising their own authority, and that's never been applied to government contracts. The second point I'll make about that is that a reasonable time requirement, which would be the only sort of contrary rule, would be one that really only applies when you have asymmetrical bargaining as in a distribution agreement, and one party had to do specific upfront costs the other party didn't have to do. The Second Circuit's case in Campagna talks about this. That doesn't apply here either. And then third, even if this court disagrees or wants to reserve that question, New York has never challenged that 70 years is not enough time, and I think it's a matter of what it really is. Justice Gorsuch? Kempner? Justice Barrett? Justice Jackson? One question. So I appreciate the very clear exposition of what the purpose of silence is in relation to background principles, but I assume the response would be, and I want to give you a chance to address it, that in a way assumes clarity and certainty about what the background contract principle is in this context. And New York says, look at all these other compacts, look at the circumstances. The background principle is you can't withdraw in this situation. So what do you have on that point? What is the background principle in this context? Two things on that point, Your Honor, from the history of compacting. The first is that it was well established by that point that compacts were contracts. I talked about Green v. Biddle from 1823, and the United States in 1950 looked at that, said, okay, if compacts are contracts, what does contract law say at the time? And contract law by 1953, Williston Section 38 and 39 speak to this, said specifically the same rule I'm saying at the lectern today. This is not some new contract rule we're trying to retroactively impose on the parties. This was well established at the time. The second thing that I think was well established, including in compacting by the early 1950s, was that there are two different kinds of agreements. There's the kind to convey or settle property, and so I've talked about cases like Fletcher and Hinderleiter and Virginia v. West Virginia, and there are cases involving just the ongoing exercise of sovereign power, whether that's delegation or just regulation. And that's cases like Newton and Providence Bank. So all of that was well established before 1953. One final point about compacting to your historical question, Justice Jackson, the only bridge that New York offers for this world of what was basically boundary compacts in the 19th century and delegated police power compacts in the 20th century is the Port Authority compact. But I think as the Chief Justice's colloquy showed this morning, those could hardly be more different. The Port Authority was a specific compact with a two-year period for both states with their own vetoes to come up with a unitary comprehensive development plan for infrastructure, and then they could withdraw if either state didn't go all in on that agreement. We have nothing like that here. We don't have silence in the Port Authority compact. We have a carefully reticulated withdrawal provision in the Port Authority compact. And no one could have looked at the Port Authority compact and said, that's exactly what's happening in the Waterfront compact either. This workers licensing agreement and that comprehensive infrastructure development plan with its own withdrawal provision couldn't have looked more different. And if I might to your negotiation question, Justice Jackson, the negotiation history at page 440 of the House hearings has testimony from the Executive Director of the Port Authority specifically emphasizing that the Port Authority and the Waterfront Commission had different models because they did different things. One was proprietary infrastructure, and one was worker licensing, and the latter needed to be more accountable to the states. So even to the specific negotiation history, I don't see how that helps New York. Thank you. Thank you, Counsel. Mr. Rayner? Mr. Chief Justice, and may it please the Court, under settled compact interpretation principles, New Jersey should prevail in this case. New York doesn't dispute most of those principles. It agrees that the compact does not expressly preclude unilateral withdrawal. It agrees that contract law permits unilateral withdrawal in cases of ongoing and indefinite performance, and it agrees that courts presume that a sovereign has not ceded its ongoing police powers. Instead, New York contends that compacts have long been understood to preclude unilateral withdrawal, but the historical record doesn't support that claim for compacts like this one that involve the ongoing and indefinite exercise of sovereign police power. New York also critiques the line drawing that it says is required under New Jersey's interpretation, but New York itself avoids that line drawing only by adopting a categorical rule that dispenses with settled interpretive principles. I welcome the Court's questions. Mr. Rayner, is the compact federal law, or is Congress's consent federal law? Yes, this was approved in a federal statute by Congress, signed by the President, so it is a federal law. So what role does the fact that it is a federal law play in our analysis? I think there are some circumstances where that may affect the contract law analysis. So in Alabama v. North Carolina, the Court said you can't apply background principles of contract law to overcome clear terms in the compact. That's one example where the two analyses might diverge. It's also conceivable that Congress could add a condition to its approval of the compact saying that withdrawal is inappropriate, except in certain circumstances. But it hasn't done that here. And because the compact is silent in this case on withdrawal, I think it really doesn't change the analysis. So normally a federal law has preemptive effect as between federal government and states. This is obviously not the type of law that you would normally see in that context. So if it doesn't have preemptive effect, does it have any overarching effect similar to preemption? I think it actually does have preemptive effect. So New Jersey couldn't act inconsistently with the compact while the compact is in effect. It couldn't go down to the waterfront and start obstructing what the commission is doing. I don't think that the preemption question answers the withdrawal question, though, because in our view the compact is best understood to permit withdrawal. So there's nothing about the preemptive effect of the compact that would somehow preclude that. There's been some questions this morning about whether we should follow just regular private law contract rules. And I think actually that's not a cause for concern in this case because the sovereignty principles point the same direction as the contract law principles in this case. New York has conceded that the contract law principles or that unilateral withdrawal is permissible for ongoing performance contracts. And the same rule as this court explained in Tarrant applies to compacts where we're talking about cession of sovereign authority. We're not going to assume in the face of silence that a state has given up its ability to exercise its police powers forever. So in this case I don't think you have to worry too much about segregating sovereignty-specific principles from private law principles because they dovetail and they point in the same direction. So what do we do with a compact on water rights that many of them I suspect have to do with licensing and taxation? That's comparable to here, police power. And what do we do with a compact like that? So most of the water rights compacts, Justice Sotomayor, are essentially settlement agreements because the states have conflicting claims to the water. So under this court's cases, downstream states are entitled to equitable apportionment of water flowing from upstream. And New York agrees, New Jersey agrees, we all agree that that type of settlement agreement presumptively you cannot withdraw from. Now as part of those settlement agreements, they sometimes establish commissions that are designed to facilitate the operation of the settlement. The fact that you've agreed tells us anything we say with respect to that issue would still be dicta, correct? You can't concede a point and bind other parties in another case who might have a compact of that nature and come in and say, this is just a succession of police power and you've announced in New Jersey versus New York, New York versus New Jersey. So I actually don't think that that fits really in the police power category because the commissions in those cases just facilitate the operation of the settlement. I'm just talking about something in the future. I'm beating a dead horse. Just one question. I have looked at some of the compacts and the ones that I found before 1953 that include permission to withdraw unilaterally, all of them required notice and notice of a particular amount of months, six months. I think it favors the government, New York, that this doesn't talk about withdrawal and every other one that assumes unilateral withdrawal did. What do I do with that historical fact? I agree that the absence of any dissolution provision is a marginal point in New York's favor but I don't think it carries the day here in part because notice provisions could be implied. There are some sources, the Uniform Commercial Code for example, that suggests that notice is part of the background rule here. I've been thinking about that but that really takes away from Justice Scalia's point in Alabama that we shouldn't be adding terms to compacts. Yes, I recognize that, Justice Sotomayor, but I think Alabama is distinguishable because there there was an express withdrawal provision. The court says you can't qualify it. But here since we're talking about silence and you're going to be potentially allowing withdrawal just as a matter of the default rule, I don't think there would be any Alabama problem with also saying that under that default rule notice is required. New York hasn't pressed that argument. They clearly have substantial notice in this case. As to your earlier point about binding future parties, if the court wanted to adopt a narrow interpretation here, I think a simple easy way to do it would be to say that when the compact exclusively provides for joint ongoing exercise of sovereign authority on an indefinite basis, we're going to presume that unilateral withdrawal is permissible. What about the treaty rule? It was my understanding New York said that it was the rule in treaties that unilateral withdrawal was not permitted. I thought the opposite was true from the restatement of the restatement third. So what's the United States' position? Which is the default? So the treaty rule is not very clear. The Vienna Convention says that the default is that unilateral withdrawal is not permitted. The United States is not a party to the Vienna Convention, although we accept it as a guide to these kinds of situations. I think under treaties, like under contracts, you have sort of a spectrum. And at one end, there's things that are clearly not withdrawable, so like boundary treaties, for example. And at the other end, you have commercial treaties, which do permit withdrawal. The United States has withdrawn from treaties that impose ongoing obligations. So in 2005, we withdrew from a dispute resolution protocol, and that didn't expressly provide for withdrawal. I think, and in 1951, in the Dyer brief, the Solicitor General also said treaty law would generally permit withdrawal for this category of compact. So if you're interested in treaty law, I think it still supports New Jersey in this case, but I acknowledge it's somewhat of a murky area. And given that the court has said that contract law is the correct lens for looking at these kinds of questions, I think that's the better way. But it doesn't strongly support, yeah, I mean, if treaty law is murky, that's one thing, but it doesn't, it's the United States' position that it does not strongly support New York, that we shouldn't take the Vienna Convention as a hard and fast rule, that, oh, well, in treaty law, you can't use a lot of withdrawals, so this is different. That's correct. And the Vienna Commission itself says that it can be, the default rule can be overcome by circumstances or by the intent of the party. So it sort of throws it back onto a context-specific inquiry. Can I ask you? What have we looked at? Can I just ask about what appears to be the clear preference in going the sovereignty route, and I'm just trying to understand it. If we would prefer to tab in this by keeping it in the realm of contract, would that be sufficient to rule for New York in this case, I mean, excuse me, New Jersey in this case, or would we have to have some reference to sovereignty? And let me just tell you what my concern is. You say, don't worry about it, because in this case, they both come out to the same place. But I can imagine there could be a future case in which they don't, in which you'd have contracts leading in one way and sovereignty leading in another. And I don't know that I want to signal at this point how that comes out, meaning we preference the sort of sovereignty principles in that scenario. So could I do this just on contracts, and if so, how? Yes, Justice Jackson. So to be clear, we don't have a clear preference that you go the sovereignty route. I mentioned that. I think it points the same direction, and in Tarrant, the court unanimously adopted the sovereignty presumption. But if you wanted to go just the contract route, I think that would be perfectly fine. You could say, this isn't a case like Alabama versus North Carolina where we would be using an implied contract rule to overcome the clear text of a federal statute. You would just say, look, there's silence here. We have said over and over, including in New York versus New Jersey, that background common law rules speak into the silence of a compact. And I think that would basically be the end of the analysis. Why should we not look to rules of statutory interpretation? Statutes generally remain in effect until they are, they remain in effect until they're repealed. They don't have sunset provisions. Yes, Justice Alito. So I think the reason is that the court has said these are contracts. They only come into existence by agreement of the parties. This probably wasn't something that Congress could have just done. It couldn't have just ordered the states to enter this agreement. So the consensual nature of it, I think, is critical and that's why the court has looked to contract law. I do acknowledge there are some situations with the federal statute status of the compact will change the analysis. And we've talked about Alabama versus North Carolina. That's the easiest example of that. But otherwise, I think the court has been correct to look to contract law in interpreting these kinds of agreements. Are the terms of an interstate compact federal law for all purposes? If you have something specific in mind, Justice Alito, I don't necessarily want to foreclose it, but I think it's generally. If a claim was asserted based on the terms of an interstate commerce, is that a claim arising under federal law? Yes, I believe so, Justice Alito, but I can't say that I wrote a case specifically about that, but it's considered a federal statute. And I'd like to talk for a moment about New York's historical argument. I think this is their principal affirmative argument that at the time of this compact was entered, this was understood to be not permitted. It was universally understood that withdrawal was not permitted for compacts. I think that doesn't hold water when you look closely at it. As Justice Sotomayor pointed out, two of the principal scholars on which they rely actually said the opposite. In an article around the same time, they acknowledged the United States brief and dire and said that's likely sound. And then in addition, this court said in 1951 it treated it as an open question. The Solicitor General said in cases of this kind, withdrawal is permissible and the court said we're not going to go down that road. So I think it's difficult to claim that there's a settled understanding in 1953 when the United States has taken the opposite position and this court has treated it as an open question. There's no further questions. Thank you, counsel. You've had your back and forth, right? The one-on-one questioning is? Well, you haven't? I have not. Okay. Tough day. Justice Sotomayor? Okay. I knew that. Rebuttal? Thank you, Your Honor. I have four points here. I think states and these states in particular go to the compact form when they want to keep either legislature from changing things going forward. That is why and I think this is why Congress's approval is important. They go through the bother of negotiating this whole thing, going to Congress and getting approval because it makes it a federal law and that by its nature means that they expect that each state legislature can't change its mind going forward. That's not extraordinary when it comes to compact and federal law. And there is, that is why these states do that because then you can rely on it. And these states did rely on it thinking that we've done this, we've made it a federal law and now we can rely on it, which is what they did in building the port together through the Port Authority. On this drawing lines between boundary and water on one side and ongoing performance on the other, I do not think those lines are at all so clear in compact. There are jurisdiction sharing compacts that do not draw the boundary. So those do involve jurisdiction sharing over a piece of land, but they're not actually conveying a res. There are compacts like the Port Authority and other compacts that followed it that have ongoing responsibilities over a set piece of land. And I think those compacts, like this one, they're not identical to boundary compacts, but they're not that different. They involve a piece of land and set expectations that everybody makes once they make the compact about that piece of land and what they're going to do with it going forward. And so New Jersey's default rule would upset and destabilize a whole bunch of compacts that are currently in existence. Those are listed in Appendix B in our brief. And the reliance on contract principles, so much of that comes from contracts between a sovereign and a private party. And that is not what we have here, and that's a big difference. Because the presumptions and intuitions about what states expect are different when they're with a co-equal sovereign. They expect to be giving each other some sovereignty. That's the whole point of the compact. And I think that is some of what this court was saying in Hess and Bancorp. And in Bancorp, this court said a classic condition of a compact is that you can't unilaterally change it or withdraw going forward. And states have other options if they want to cooperate and retain that flexibility. They can do what they were doing in Bancorp, which is to enact parallel laws. They can do what was the original proposal here, which was to have each two states do their own commissions and their own laws. But that was rejected, and the states did a compact instead, and they did that for a purpose. I also don't think it's at all possible to read the intent of these states as thinking that either state could have walked away after a year or two years or five years. I don't think that's reasonable. And it's not just 70 years. I don't think that's just what we're judging it from. The two states have come together and amended this compact over the decades. As recently as 2006, they amended this compact to add powers to the commission. And so they were re-upping their understanding over time that they are still in this together and that they still believe that the joint endeavor is needed. And when it comes to the statements about it being temporary, I don't think that is an indication that they had definitely determined that they would end it at any specific point. It was a prediction about we hope that we can solve this problem together and then jointly decide to end it together. But that's not how it played out. The states continued to decide over and over again as they amended this compact that they still had a joint problem that still needed the joint solution. And so they kept going. And I don't think that statements about temporary or permanent really solve the question here, which is about who gets to decide when to end it. It's not really about when. It's about who gets to decide. And the intent of these states was that they would decide together. Or if they really absolutely needed to, they would go to Congress. Thank you. Thank you, counsel. The case is submitted.